UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN ROUNDS and
RAYMOUN HARRIS,

      Plaintiffs,

v.

PHIL'S KAR KARE and
PHILIP GIACONA, JR., jointly
and severally,

      Defendants.

Case No. 16-13170
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

**OPINION AND ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT [26]**

Philip Giacona Jr. owns Phil's Kar Kare. Phil's Kar Kare details vehicles for the Parkway Chrysler dealership. Giacona hired Raymoun Harris in 2013, and Allen Rounds in 2014. Rounds and Harris detailed cars.

Giacona paid Rounds and Harris—by personal check—a weekly, agreed-upon amount. Rounds and Harris say they were Giacona's employees, working sixty-hour weeks and handling all the car detailing business Giacona could generate. Giacona says the men were independent contractors free to set their own hours and solicit their own business.

In 2016, Rounds and Harris filed the current lawsuit alleging violations of the Fair Labor Standards Act and its Michigan analog. The men claim Giacona misclassified them as independent contractors, allowing Giacona to avoid paying them minimum wage and overtime. Soon after filing suit, Giacona fired both Rounds and Harris.

Rounds and Harris now move for summary judgment on their claims. Yet on the record before the Court, genuine issues of material fact remain. So, for the reasons that follow, the Court will deny Rounds and Harris' motion.

**I.**

Philip Giacona Jr. owns Phil's Kar Kare. (R. 26, PID 147, 151.) His son, Phil III, now runs it for him. (R. 26, PID 151.) Phil' Kar Kare details vehicles for the Parkway Chrysler dealership in Clinton Township, Michigan. (R. 26, PID 148.) The business is behind the Parkway dealership. (*Id.*) The dealership and Phil's Kar Kare keep the same hours of operation: 9:00–6:00 Tuesday, Wednesday, Friday; 9:00–9:00 Monday and Thursday; and 9:00–3:00 on Saturday. (R. 16, PID 244.) Parkway provides the cars for Phil's Kar Kare to detail. However, the two businesses are separate entities. (*Id.*)

**A.**

Giacona relies on eight detailers to handle the actual car detailing. (R. 26, PID 156.) When Giacona hires detailers, he offers a flat, weekly rate that he terms the "base pay." (R. 26, PID 152.) Giacona pays his detailers by personal check, occasionally offering cash bonuses or advances on the next week's pay. (*Id.*)

In October 2013, Giacona hired Raymoun Harris. (R. 26, PID 202.) Eight months later, Giacona brought on Allen Rounds. (*Id.*) Giacona advertised job openings by word of mouth. Usually, prospective detailers had prior experience in car washes, or learned on the job. (R. 26, PID 151.) Learning on the job was easy—as Giacona put it, "[i]t doesn't take a scientist to wash a car." (R. 26, PID 151.)

The dealership provides the daily flow of cars to Phil's Kar Kare. (R. 26, PID 150.) To manage the flow, each morning Giacona posted a list of Parkway cars to be detailed that day.

(R. 26, PID 155.) The list included new and used cars for sale on Parkway's lot, cars owned by Parkway's customers, and so-called "showrooms"—vehicles earmarked for display inside the dealership thereby requiring extra attention. (R. 26, PID 152, 164.) Sometimes, detailers handled the list in whatever order they wished (R. 26, PID 155), and sometimes Giacona directed his detailers to handle the list in a certain order (R. 26, PID 151). Other times a car would come in and Giacona made sure "who's ever not doing anything washes it." (*Id.*) Still other times, Giacona changed the list order based on customer demand (R. 26, PID 156), his business priorities (R. 26, PID 155), or the need to offer complimentary services to Parkway's owners (R. 26, PID 161).

Along with six other detailers, Rounds and Harris handled the daily flow. (R. 26, PID 152.) On a normal day, the detailers worked in two-person teams to clean the listed cars. (R. 26, PID 151.) Used cars took an hour, new cars required twenty minutes, and showrooms required thirty minutes—ten extra minutes to apply spray wax. (R. 26, PID 164.) On busy days, the eight detailers sometimes worked five cars at a time. (R. 26, PID 151.) On slower days, Giacona says he sent detailers home without pay—a practice another detailer referred to as optional days off. (R. 26, PID 156, 244.)

Every day, detailers ordered the supplies they needed through "the supply lady," (R. 26, PID 155), and Giacona paid for all supplies. (*Id.*) Along with supplies, Giacona provided rented uniforms for his detailers, although Giacona says he never required detailers to wear them. (R. 26, PID 177.) Giacona says the detailers willingly paid him a $7 weekly uniform fee. (*Id.*) And Giacona deducted the uniforms' rental cost as a business expense. (*Id.*)

As compensation for their work, Rounds and Harris initially received a flat, weekly rate of $300. (R. 26, PID 183, 214.) Giacona raised the base pay in regular increments: by the time they were fired, Harris made $500 per week (R. 26, PID 187), and Rounds took home $400 (R. 26, PID

3

215). (*See also* R. 26, PID 160.) After a busy week, Giacona occasionally offered cash bonuses, saying "when I made a lot of money—more money, they'd make more money." (R. 26, PID 161.)

From Giacona's perspective, the detailers worked a flexible schedule. (R. 26, PID 170.) Detailers could come and go as they pleased. (R. 26, PID 156, 170.) Giacona says on slow days, he sent detailers home without pay. (R. 26, PID 156.) He also says the detailers never worked sixty hours per week. (R. 26, PID 170.) And if detailers handled the daily flow with time to spare, Giacona claims he let them solicit business. (R. 26, PID 154–55.) When detailers solicited their own business, Giacona says he let them use Phil' Kar Kare supplies but keep the money they earned. (*Id.*)

Other people connected to Phil's Kar Kare also say the detailers solicited business. Fred Kakos owned a shop not far from Phil's Kar Kare. (R. 32, PID 427.) Kakos says he let the detailers wash his car. (*Id.*) Kakos also saw the detailers going through a nearby strip-mall to solicit business. (*Id.*) Another detailer, Frederick Haskins, says he went looking for customers among Parkway's staff, but never ventured any farther. (R. 26, PID 236.)

Jerry Robinson, also a Phil's Kar Kare detailer, says that Rounds and Harris actively solicited their own business. (R. 26, PID 247–48.) Robinson says Rounds and Harris solicited so much business, they prioritized their cars over Giacona's list. (R. 26, PID 250.) Robinson says soliciting business earned Rounds and Harris an additional $400 to $500 per week (R. 26, PID 248.)

Giacona says the detailers had every right to earn extra cash: he considered them independent contractors.[1] (R. 26, PID 157–58.) And Giacona's tax filings treated them

---

[1] Shortly after firing Rounds and Harris, Giacona retired and left the business to his son, Philip Giacona III. (R. 26, PID 151.) Giacona III classifies the detailers as employees, provides

4

accordingly. Giacona says the detailers filled out W-9s, but W-9s for Rounds and Harris are not in the record. (*See e.g.*, R. 26, PID 288–89.) Giacona also claims he provided his detailers with 1099s (R. 26, PID 156, 173), though Harris says he never received one (R. 26, PID 186; *see also* R. 26, PID 289).

However, tax forms for Phil's Kar Kare detailers were sent to the IRS lacking signatures, social security numbers, or addresses. (R. 26, PID 163.) The W-9s for other detailers that are in the record lack signatures (R. 26, PID 317) and addresses (*Id*. at 319–20.) And the 1099s in the record, including ones for Rounds and Harris, lack social security numbers and addresses. (R. 26, PID 311–16.) Rounds and Harris say Giacona filed 1099s for them, so Giacona left out the crucial information.[2] (R. 26, PID 311–12, 316.) Yet Giacona does not remember filing 1099s for any of his detailers. (R. 26, PID 174.) He claims any tax preparation and filing would have been handled by his accountant. (R. 26, PID 174.)

Overall, Giacona was not much of a record keeper. Prior to January 2017, Giacona did not have a timeclock, never maintained a payroll, and did not record his detailers' hours. (R. 26, PID 156.) However, he did maintain a system to record the number of cars detailed. (R. 26, PID 151.) So Giacona's tax filings memorialized the gross sales revenue for Phil's Kar Kare. In 2013, Phil's Kar Kare detailed enough cars to bring in $376,819. (R. 26, PID 296.) In 2014 and 2015, Kar Kare's gross sales totaled $546,781 and $510,001 respectively. (R. 26, PID 298, 300.) In 2016, gross sales dipped to $478,714. (R. 26, PID 302.)

---

W-2s, maintains a timeclock, and keeps detailers' hours to around 40 per week. (R. 26, PID 159.) Giacona says they went to the new system because Giacona "wanted it to be right." (*Id*.)

[2] Giacona's tax filings raise questions. For example, in 2013 Phil's Kar Kare's Form 1040 leaves blank the cost of labor. However, Giacona says Phil's Kar Kare had detailers in 2013. (R. 26, PID 174.) One of those detailers was Raymoun Harris, working at $300 per week. (R. 26, PID 202.)

5

**B.**

Rounds and Harris tell a different story about their work at Phil's Kar Kare. They both claim Giacona required detailers to work sixty hours per week. (R. 26, PID 183, 214.) Other detailers say they also worked sixty hours per week. (*See* R. 26, PID 235, 244.) Rounds and Harris spent their time detailing eighty to 100 Parkway cars per week. (R. 26, PID 183.) They worked on a set schedule to wash the listed cars as directed by Giacona, sometimes forced to stay past business hours to get all the work done. (R. 26, PID 193.) Giacona did not permit them to come and go. (R. 26, PID 227.) Instead, Giacona made detailers spend their free time washing certain cars for free. (R. 26, PID 227.) If the men wanted to take a day off, they had to call in and would not be paid. (R. 26, PID 187, 194, 214, 235.)

**C.**

Eventually Giacona fired Rounds and Harris. But the parties tell divergent stories about that, too. Giacona offers a few reasons for firing Rounds and Harris: the two men smoked pot at work (R. 26, PID 158), Rounds showed up intoxicated (*Id.*), and Harris got into an argument with Giacona over the list order (R. 26, PID 261). Other detailers say the two men stole supplies. (R. 26, PID 166.) And Jerry Robinson adds that the men were fired for enjoying "extremely" long breaks. (R. 26, PID 250.) By contrast, Rounds says he was fired after asking to be paid minimum wage, and soon after initiating his lawsuit. (R. 26, PID 224.) Harris says he never touched drugs or alcohol at work, but does remember arguing with Giacona over the order for washing cars. (R. 26, PID 194.)

**D.**

Because Rounds and Harris believe they were employees entitled to minimum wage and overtime pay, they filed suit. Rounds and Harris allege violations of the Fair Labor Standards Act,

29 U.S.C. § 201 *et seq.*, and the parallel Michigan Workforce Opportunity Wage Act, Mich. Comp. Laws § 408.411 *et seq.* Rounds and Harris also bring a civil damages claim due to Giacona's allegedly fraudulent filing of 1099s. *See* 29 U.S.C. § 7434. (R. 26, PID 123.) Rounds and Harris moved for summary judgment, arguing that as a matter of law, they are employees under the FLSA. (R. 23.) Giacona, in response, argues that Rounds and Harris were independent contractors and thus, not covered by the FLSA.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. As Rounds and Harris move for summary judgment, they must "show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012). If Rounds and Harris carry their initial burden, then Giacona "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At that point, the Court must view the evidence and all reasonable inferences in the light most favorable to Giacona. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

But in an FLSA misclassification case, the extent of the jury's role is itself an issue. At one point, a worker's FLSA classification was purely a legal question. *See Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984). However, over time the Sixth Circuit began reviewing FLSA classification as a mixed question of law and fact—in line with other circuits. *See Werner v. Bell Family Med. Ctr., Inc.*, 529 F. App'x 541, 543 (6th Cir. 2013) (compiling cases); *see also Dole v.*

7

*Snell,* 875 F.2d 802, 805 (10th Cir. 1989); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987); *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (2d Cir. 1987).

In *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804–805 (6th Cir. 2015), the Sixth Circuit seems to have gone a step farther. Although *Keller* acknowledges that FLSA classification is a mixed question of law and fact, it nonetheless holds that the ultimate question—whether the worker was an employee or independent contractor—is for a jury to decide unless a reasonable jury could decide it only one way. *See* 781 F.3d at 806. In particular, *Keller* held that "[s]ummary judgment for the defendant is not appropriate where the factfinder could reasonably find that a FLSA plaintiff was an employee." 781 F.3d at 816.[3] So, in Rounds and Harris' case, they are entitled to summary judgment only if they show that every reasonable jury would find they were employees. *Id.*

### III.

Rounds and Harris move for summary judgment on their claim that they were employees as defined by the FLSA. From there, they also seek summary judgment on their claims for minimum wage and overtime, Giacona's individual liability, a three-year FLSA statute of limitations, and liquidated damages. They also argue summary judgment is proper on a civil-damages claim stemming from Giacona's alleged willful violation of the Internal Revenue Code.

### A.

The Court begins with Rounds and Harris' claim that they were employees of Phil's Kar Kare. They point out that Phil's Kar Kare depended on their labor, detailers worked sixty-hour

---

[3] *Keller* is in line with other circuits that treat the issue as a mixed question of law and fact, but nonetheless permit district courts to submit the ultimate question to the jury. *See Johnson v. Unified Gov't of Wyandotte County/Kansas City*, 371 F.3d 723, 728 (10th Cir. 2004); *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir. 1999); *see also Lauritzen*, 835 F.2d at 1542 (Easterbrook, J., concurring).

8

weeks, Giacona directed their labor, and Giacona bought all supplies. Thus, Round and Harris say, they were employees and not independent contractors.

The distinction matters because employees receive the FLSA's minimum wage and overtime protections while independent contractors do not. *See Keller*, 781 F.3d at 806. The FLSA broadly defines employees as "any individual[s] employed by an employer." *See* 29 U.S.C. § 203(e)(1). Recognizing the breadth of that definition, the Supreme Court holds that the operative inquiry is whether a worker is "in economic reality" an employee. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The relevant "economic reality" is whether workers "are dependent upon the business to which they render service." *Keller*, 781 F.3d at 807 (quoting *Donovan v. Brandel*, 736 F.2d 1114, 116 (6th Cir. 1984)).

To determine whether a worker is indeed "dependent upon the business to which they render service," the Sixth Circuit has identified six factors to be considered: the "permanency" of the parties' relationship; the "degree of skill required" to perform the job; whether the worker's level of skill creates "any opportunity for profit or loss"; any "investment in equipment or materials" the worker must make to do the job; the "degree" to which the "alleged employer" enjoys a "right to control the manner in which the work is performed"; and whether the worker's role is "an integral part of the alleged employer's business." *Keller*, 781 F.3d at 807 (citing *Brandel*, 636 F.2d at 1117, n.5).

No single factor is dispositive of a worker's employment classification. *Keller*, 781 F.3d at 807. Rather, the inquiry considers a totality of the circumstances. *Id.* at 815. As such, on top of the listed factors, the Court may consider other aspects of the economic relationship at issue. *Id.* Appreciating the totality of the circumstances, the Court assesses the economic relationship

9

between the detailers and Phil's Kar Kare with an "eye toward the ultimate question—[Rounds and Harris'] economic dependence on or independence from [Phil's Kar Kare]." *Id.*

**1.**

The first factor focuses on the "permanency" of the parties' relationship. An employee's relationship with an employer tends to be "continuous and indefinite in duration," while an independent contractor often works a "fixed period" and "transfer[s] place to place as particular work is offered to them." *Keller*, 781 F.3d at 807. So permanency looks to things like the "length and regularity" of the working relationship, control over workers' schedules, and the number of jobs a worker has at one time. *Id.*

On this record, there is no dispute Giacona hired his detailers for a "continuous and indefinite duration." Harris worked at Phil's Kar Kare for nearly three years; Rounds worked at Phil's Kar Kare for about eighteen months. (R. 26, PID 127; R. 31, PID 332.) Giacona confirmed that detailers worked for him as long as they accepted the "base pay."

But there is a genuine issue of fact regarding Giacona's control over the detailers' schedules. Rounds, Harris, and other detailers all say they had to work sixty-hour weeks at Phil's Kar Kare. Rounds and Harris say Giacona made detailers call in if they wanted to take a day off, and they lost pay if they did. Plus, Giacona conceded he sent detailers home when business was slow. So Rounds and Harris say the facts indisputably point to an employer–employee relationship. Yet Giacona maintains that Rounds and Harris had flexible schedules. Though Giacona did not keep employment records, he testified that Rounds and Harris never had to work sixty-hour weeks. Giacona remembers that Rounds and Harris could come and go as they pleased or take long breaks. Giacona only directed Rounds and Harris' labor when the pair were not otherwise busy washing cars they solicited, even though Giacona says he fired Harris over a scheduling dispute. And

Giacona claims Rounds and Harris had optional days off when business was slow. So Giacona thinks the facts indisputably show the detailers were independent contractors.

In sum, a reasonable jury could credit Giacona and conclude that, despite the indefinite duration of the economic relationship, Giacona did not exercise exclusive control over the detailers' schedules.

### 2.

The second factor looks to the "degree of skill required" to perform the work. The overarching inquiry remains the economic dependence or independence of the worker. So the "degree of skill" prong assesses whether a worker's increased efficiency improves their profit-potential; whether a worker has opportunities for judgment-driven performance; or whether the worker is paid on a piecework basis. *See Rutherford*, 331 U.S. at 730; *Keller*, 781 F.3d at 809.

On this record, there is no dispute that Rounds and Harris were hired to perform a single task: detailing cars. To learn the task, Giacona never needed to provide much training. He admits "[i]t doesn't take a scientist to wash a car." (R. 26, PID 151.) Plus, no matter how skilled Rounds and Harris may have been, Giacona charged customers the same amount whether an experienced or rookie detailer washed the car. So they did not increase their economic independence simply by improving their skills.

However, the parties dispute whether Rounds and Harris had opportunities for judgment-driven performance and whether their efficiency increased their profits. Giacona repeatedly asserts that detailers could solicit business and keep the proceeds. And Giacona says he allowed detailers to set their own work schedules. Thus, it is reasonable to infer that Rounds and Harris had opportunities for judgment-driven performance. Rounds and Harris could set their daily schedules to maximize time spent soliciting business. Likewise, it is reasonable to infer that if Rounds and

11

Harris increased their efficiency, they could increase their profits. The more efficiently Rounds and Harris detailed vehicles, the more vehicles they could detail in a day. Jerry Robinson says that is exactly what happened: he claims Rounds and Harris were so efficient and so frequently drumming up business that they earned an additional $400 to $500 per week. In other words, Robinson says Rounds and Harris earned as much from soliciting additional business as they did from Giacona's business. Thus, a reasonable jury could find that Rounds and Harris had opportunities for judgment-driven performance and could realize gains from their greater efficiency.

### 3.

The third factor assesses Rounds and Harris' capital investment. In assessing a worker's investment, the relevant comparison is "the worker's investment in the equipment to perform his job [against] the company's total investment . . . ." *Keller*, 781 F.3d at 810 (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008)). The greater the company's investment in the equipment, the more likely the worker was an employee. When weighing investment, the key inquiry is whether Rounds and Harris' capital investment provided for their economic independence. *Keller*, 781 F.3d at 810.

On the undisputed record, every reasonable jury would find that the capital investment prong weighs in favor of finding an employer–employee relationship. For one, Giacona confirms he made all capital investments and purchased all supplies. His tax filings confirm as much: in 2013 he deducted $87,974 worth of materials and supplies; $130,350 in 2014; $62,148 in 2015; and $93,417 in 2016. (R. 26, 297–303.) So Giacona made the entirety of the capital investments required to maintain the business; Rounds and Harris made none. Thus, the record is undisputed that Rounds and Harris made no capital investment. This signals their economic dependence.

**4.**

The fourth factor considers Rounds and Harris' opportunity for profit and loss. The focus here is on Rounds and Harris' opportunity to use their "management and technical skills." *Keller*, 781 F.3d at 812 (citing *Brandel*, 736 F.2d at 1119). The more Rounds and Harris relied on their "management and technical skills" to maintain a degree of control over their profitability, the more likely they were independent contractors. *See Keller*, 781 F.3d at 812.

Rounds and Harris say they had no opportunity to use their management and technical skills to turn a profit. They claim Giacona set the daily schedule and maintained a steady flow of dealership vehicles they had to wash per Giacona's instructions. Giacona sometimes added to the schedule to make detailers offer free washes to the dealership's owners. Rounds and Harris earned the flat, "base pay" with occasional tips or bonuses only if Giacona managed to bring in enough dealership vehicles. Sometimes, Giacona brought in so much business that Rounds and Harris worked past closing to finish it all, further eroding Rounds and Harris' control over their management and technical skill. Overall, say Plaintiffs, Giacona kept such tight control over the daily schedule that he fired Harris for trying to deviate from it. And on slow days the parties agree that Giacona sent detailers home without pay. So Rounds and Harris say they were employees.

On the other hand, Giacona claims Rounds and Harris had daily opportunities to use their management and technical skills. Giacona says Rounds and Harris could show up whenever they wanted, and solicit their own business. By soliciting business, Rounds and Harris could determine the number of cars detailed in a day—in other words the pair exercised "control over the essential determinants of profits . . . ." *Dole v. Snell*, 875 F.2d 802, 810 (2d Cir. 1989). Fred Kakos says he watched Rounds and Harris drum up business in the strip-mall next to Phil's Kar Kare. Kakos also says Rounds and Harris washed his car on occasion. Again, testimony in the record indicates that

13

Rounds and Harris each made $400 to $500 per week in addition to the "base pay." Giacona contends Rounds and Harris did not need to follow any set washing schedule. Only if Rounds and Harris were not busy washing cars they solicited did Giacona assign them a Parkway vehicle.

On this record, a reasonable jury could believe Giacona and conclude that Rounds and Harris had opportunities to use their management and technical skills. Settling the issue again requires a credibility determination.

### 5.

The fifth factor assesses whether Phil's Kar Kare "exercised control over [Rounds and Harris'] work." *Keller*, 781 F.3d at 813. To be sure, even employees enjoy some flexibility to set their own hours or vacation days. *Id.* at 814. So the assessment of Phil's Kar Kare's control turns on whether Rounds and Harris worked a schedule that left it "practically impossible for them to offer services to other employers." *Id*. If so, they were more likely employees.

Here, the facts at issue are similar to the facts at issue in probing Rounds and Harris' opportunity for profit and the permanency of the relationship. The parties take appreciably different positions on the hours worked, flexibility of the schedule, and extent of Giacona's control over day-to-day business. So on this issue, too, resolving the factual issue requires a credibility determination.

### 6.

The sixth factor looks at whether Rounds and Harris "rendered services that [were] 'an integral part' of [Phil's Kar Kare]." *Keller*, 781 F. 3d at 815 (quoting *Brandel*, 736 F.2d at 1119–20). "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer–employee relationship." *Keller*, 781 F.3d at 815.

On the undisputed record, the "integral part" factor points toward an employer–employee relationship. Giacona says he depended on the detailers' labor to get the job done. At Phil's Kar Kare, detailing cars was the only job to get done. So every reasonable jury would find that the detailers were integral to the business.

**7.**

When assessing the economic relationship between two parties, the economic-reality test is not limited to six factors. *Keller*, 781 F.3d at 816. Looking to the totality of the circumstances, the economic reality test also accounts for a requirement that workers wear uniforms, whether a business keeps employment records, or whether a business has the ability to hire and fire. *Id.*

Here, a reasonable jury could find that Giacona's use of uniforms, the $7 weekly uniform fee, and Giacona's authority to hire and fire all indicate employer–employee status. On the other hand, a reasonable jury could believe Giacona never required the detailers wear the uniforms, and credit Giacona's claim that he never kept employment records and so find an independent contractor relationship. So fact disputes exist with respect to the miscellaneous factors.

\* \* \*

At bottom, genuine issues of material fact and the reasonable inferences drawn therefrom could lead a reasonable jury to find Rounds and Harris were economically independent from Phil's Kar Kare. *See Keller*, 781 F.3d at 806. Taking the facts in the light most favorable to Giacona, a reasonable jury could find some factors favor or even strongly favor a finding that Rounds and Harris were independent contractors; other factors favor or strongly favor a finding they are employees. Therefore, even though some of the factors point toward an employer–employee relationship, a reasonable jury could find that the men were independent contractors. *Id.* at 816. As such, Rounds and Harris have not carried their summary-judgment burden. So with respect to

Rounds and Harris' claim that they were employees, the Court DENIES their motion for summary judgment.

Moreover, as Rounds and Harris' remaining FLSA claims all turn, in part,[4] on whether they were employees of Phil's Kar Kare, the Court DENIES their motion for summary judgment with respect to those claims as well.

**B.**

Rounds and Harris also move for summary judgment on a civil damages claim stemming from Giacona's alleged violation of § 7434 of the Internal Revenue Code. 26 U.SC. § 7434. Section 7434 prohibits the "'willful[] fil[ing]' of 'a fraudulent information return with respect to payments purported to be made to any other person.'" *Vandenheede v. Vecchio*, 541 F. App'x 577, 580 (6th

---

[4] Even if the Court found that Rounds and Harris were employees, the record does not warrant a grant of summary judgment on Rounds and Harris's minimum wage and overtime claims.

The FLSA does not apply to every employer. An employer must pay minimum wage and overtime if their employees fall within the scope of individual coverage, or their business falls within the scope of enterprise coverage. *See* 29 U.S.C. §§ 206(a), 207(a). Rounds and Harris plead FLSA liability on a theory of enterprise coverage. (R. 1, PID 5.) So on summary judgment, Rounds and Harris must establish that Phil's Kar Kare was a covered employer. See 29 U.S.C. §§ 203(r), (s)(1). A covered employer must have an "annual gross volume of sales" at or in excess of $500,000. 29 U.S.C. § 203(s)(1); see also 29 C.F.R. 779.259.

In their motion for summary judgment, Rounds and Harris do not address whether Phil's Kar Kare is subject to the FLSA's enterprise coverage. But establishing enterprise coverage is Rounds and Harris' burden to bear. *See Thorne v. All Restoration Servs.*, 448 F.3d 1264, 1265–66 (11th Cir. 2006); *Hutchinson v. Honeymoon Corp.*, No. 16-00018, 2017 U.S. Dist. LEXIS 208439, at *6 (N.D. Ohio Dec. 19, 2017); *McWilliams v. Dialog EMS, Inc.*, No. 06-02001, 2007 U.S. Dist. LEXIS 42875, at *6 (N.D. Ohio June 13, 2007). Rounds and Harris do, however, provide some of Giacona's tax filings. For tax years 2013 through 2016, Rounds and Harris provide a Form 1040 for Phil's Kar Kare. (R. 26, PID 296–303.) According to the 1040s, Phil's Kar Kare's gross sales only met or exceeded $500,000 in 2014 and 2015. (See R. 26, PID 298, 300.) Other parts of the record corroborate the tax forms' gross sales numbers. (See R. 26, PID 171–72, 202.)

Rounds and Harris do not point to facts suggesting that in 2013 or 2016 Phil's Kar Kare enjoyed gross sales at or above $500,000. So Rounds and Harris have only established enterprise coverage for tax years 2014 and 2015; they have not established enterprise coverage for tax years 2013 and 2016.

16

Cir. 2013) (citing 26 U.S.C. § 7434(a)). The "other person" has a civil damages remedy, *see* 26 U.S.C. §7434(b), provided they can show "intentional wrongdoing" on the part of the filer, *Vecchio*, 541 F. App'x at 580 (citing *Maciel v. Comm'r*, 489 F.3d 1018, 1026 (9th Cir. 2007); *Granado v. Comm'r*, 792 F.2d 91, 93 (7th Cir. 1986)).

Rounds and Harris argue that no genuine issue of material fact exists as to Giacona's willfulness. They point to the 1099s they say Giacona filed. Rounds and Harris say Giacona never provided the 1099s to them. (R. 26, PID 136.) And the documents were missing social security numbers and addresses. (*Id.*) Thus, Giacona intentionally (meaning willfully) filed a "fraudulent information return." *See* 26 U.S.C. § 7434.

But a material issue of fact exists. The record does not establish that Giacona actually filed the 1099s at issue. Rounds says he received the 1099s from Phil's Kar Kare, but is less clear on whether he actually filed them. (*See* R. 380–81.) While Harris says he never received 1099s, (R. 26, PID 186), it is not a reasonable inference to thus conclude that Giacona filed the 1099s for him. In fact, Giacona does not recall ever filing any 1099s. (R. 26, PID 176.) Instead, Giacona says he left tax filings to his accountant, (*Id.*), but his accountant never kept records and has since died (R. 26, PID 284). So it is not clear that Giacona actually filed the tax returns in question. And as stated, § 7434 prohibits the "'willful[] fil[ing]' of 'a fraudulent information return with respect to payments purported to be made to any other person.'" *Vandenheede*, 541 F. App'x at 580. Therefore, the Court cannot say, as a matter of law, Giacona willfully violated § 7434.

In sum, a reasonable jury could credit Giacona's account that his former tax preparer filed the returns, and did so absent the proper information. So the Court denies Rounds and Harris' motion for summary judgment.

**IV.**

For the reasons set forth above, the Court DENIES Rounds and Harris' motion for summary judgment. A reasonable jury could conclude that Rounds and Harris were independent contractors. Therefore, summary judgment on the FLSA claims is not proper. Likewise, a reasonable jury could find that Giacona did not willfully violate §7434.

Dated: February 26, 2018

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 26, 2018.

s/Keisha Jackson  
Case Manager